Denise YORK, As Administratrix of the Estate of Michael York, Appellant–Plaintiff Below,

v.

UNION CARBIDE CORPORATION, Appellee–Defendant Below.

No. 56A05–9102–CV–42.[1]

Court of Appeals of Indiana, Third District.

Feb. 11, 1992.

1. This case was diverted to this office by order    of the Chief Judge.

Saul I. Ruman, Thomas A. Clements, David M. Hamacher, Ruman, Clements & Tobin, P.C., Hammond, for appellant-plaintiff below.

Douglas K. Dieterly, Gerald F. Lutkus, Barnes & Thornburg, South Bend, for appellee-defendant below.

STATON, Judge.

Denise York, administrator of the estate of her late husband Michael, appeals the trial court grant of summary judgment in favor of Union Carbide Corp. in York's wrongful death action. York filed a product liability claim against Union Carbide sounding in negligence and strict liability. To support her contention that summary

judgment was not appropriate, York presents four issues for our consideration, which we consolidate and rephrase as:

I. Whether Union Carbide fulfilled its duty to warn the decedent of the hazards associated with the use of its product.

II. Whether York's cause of action is preempted by federal law.

Affirmed.

At the time of the accident that took his life, Michael York was employed as a millwright at U.S. Steel Corp. (USX). In March of 1986, USX shut down production of a 32–foot deep steel-making furnace known as the "Evelyn vessel" to reline its brick interior. The vessel is located in the No. 1 Basic Oxygen Process ("BOP") shop at USX's Gary, Indiana facility. As part of the "reline" procedure, scaffolding is erected to support an industrial elevator carrying workers from a repair platform, located about eight feet above the top of the vessel, to the vessel floor.

When the Evelyn vessel is in production, argon gas[2] supplied by Union Carbide flows through a main supply line, and then is injected into molten steel from the bottom of the chamber through 16 nozzles. Argon is pumped into the vessel to churn the molten steel, a process that causes impurities to rise to the top where they can be drawn off.

When the vessel is not in production, the flow of argon gas through the main supply line is automatically shut off and diverted to a small "bypass" supply line, also leading to the 16 nozzles. The purpose of the bypass line is to supply a small amount of argon gas to the chamber to keep the nozzles clear of debris.[3] Union Carbide did not participate in the design, installation, maintenance, or operation of the piping system or its controls.

During the reline procedure, the pipelines carrying argon to the bottom of the vessel were disconnected. On March 29, 1986, the argon hoses were reconnected, though work on the reline was not completed until two days later. Immediately, argon gas began flowing through the bypass line into the chamber, but went undetected because air was circulated into the vessel by a high volume air mover. At 3:30 p.m. on March 31, the reline was completed and the air mover was disconnected and removed. About an hour later, a USX technician conducted an oxygen deficiency test by lowering a sensor into the vessel from the repair platform located some 40 feet above the vessel floor. The technician attempted to register the oxygen content at a "breathing zone" of five to six feet above the vessel floor, but apparently took a reading from the ten to twelve foot level. This test indicated that there was no oxygen deficiency.

Shortly thereafter, Michael York and a co-worker, Costas Lalios, took the elevator to the bottom of the vessel in order to prepare the scaffolding for removal. Ten to fifteen minutes later, workers on the repair platform observed York and Lalios lying motionless on the vessel floor. It was later determined that argon gas had accumulated in the lower part of the vessel, displacing the oxygen and causing the deaths of York and Lalios by asphyxiation.

## STANDARD OF REVIEW

Indiana Rules of Procedure, Trial Rule 56(C), in effect at the time of the trial

---

**2.** Argon is a colorless, odorless, non-toxic inert gas. However, because it is much heavier than oxygen and other gases found in the air we breathe, argon will displace oxygen when introduced into a confined space such as the Evelyn vessel, much like water poured into a pitcher will displace air. Thus, argon can cause rapid asphyxiation in a confined space that is not adequately ventilated.

**3.** The supply lines to the Evelyn vessel had the following opening and shut-off mechanisms: the main valve is followed by a manual ball valve, both of which control the supply of argon

gas to both the main and bypass lines to the vessel; the argon supply line then separates into the main and bypass lines, each of which has a manual ball valve, followed by an electronic valve, still another manual ball valve, and then a "blank." A "blank" is a round sheet of metal that may be inserted between two flanges in a pipe to shut off all flow of gas through the line. In addition, the main argon gas supply line to the vessel splits up into 16 lines, one for each nozzle, with each line containing a manual valve followed by an electronic shut-off valve.

court's ruling, mandates the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, admissions and affidavits filed pursuant to Trial Rule 5(D), together with any testimony show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *See also Watson v. Golden Rule Insurance Co.* (1990), Ind.App., 564 N.E.2d 302, 306. When the movant makes and supports a motion as provided in T.R. 56(C),

> an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

T.R. 56(E).

In other words, when a defendant moving for summary judgment makes a prima facie showing to negate an element of a cause of action, or the undisputed facts nevertheless show the movant is entitled to judgment as a matter of law, the burden shifts to the plaintiff to demonstrate the existence of a factual issue for trial. *Chester v. Indianapolis Newspapers, Inc.* (1990), Ind.App., 553 N.E.2d 137, 141, *trans. denied.* Evidence must be construed in favor of the non-movant, and any doubt about the existence of a genuine issue of material fact must be resolved against the moving party. *Interstate Auction, Inc. v. Central National Insurance Group, Inc.* (1983), Ind.App., 448 N.E.2d 1094, 1097, *reh'g denied.* A factual issue is said to be "genuine" if a trier of fact is required to resolve the opposing parties differing versions of the underlying facts. *F.W. Means & Co. v. Carstens* (1981), Ind.App., 428 N.E.2d 251, 258, *trans. denied.* A fact is "material" for the purposes of a summary judgment motion if it facilitates the resolution of any of the issues involved. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 157, *reh'g denied.*

While York is correct in her assertion that a negligence action is a fact-sensitive proceeding, generally not susceptible to resolution in a summary adjudication, both parties recognize "there are some instances in which, even if the facts are as plaintiff asserts them to be, the presence or absence of negligence or contributory negligence can be found as a matter of law and the entry of summary judgment for defendant is proper." 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2729, at 212–17 (1983).

In granting summary judgment, the trial court concluded that:

(1) Union Carbide fully satisfied its duty to warn regarding the risk of argon in confined spaces;

(2) USX was an experienced, knowledgeable, and sophisticated user of argon. USX understood and took steps consistent with Union Carbide's warnings by establishing procedures and training programs which, if followed, would have avoided the risk of argon asphyxiation;

(3) Plaintiff's death was proximately caused by numerous violations by USX personnel (including but not limited to [decedent]) of USX safety rules and procedures, and by a failure to heed Union Carbide's warnings and safety instructions. The accident was not proximately caused by a failure on the part of Union Carbide to provide adequate warnings concerning the use of its product;

(4) Under Indiana law, odorization was not required in light of Union Carbide's extensive product warnings, and the safety measures implemented by USX consistent therewith. Further, the lack of an odorant in the argon can not be attributed to Union Carbide as the proximate cause of the accident in that USX did not want to purchase odorized argon, USX did not want to use odorized argon, and USX never requested odorized argon;

(5) As an additional, independent, and/or alternative ground, plaintiff's cause of action is expressly as well as impliedly preempted by the Federal Hazard Communication Standard.

Record, pp. 278–79.

## I. FEDERAL PREEMPTION

Although the parties save the issue of federal preemption for their final argu-

ments, we will address the preemption issue first, for the obvious reason that we may not review an area of product liability law (in this case, adequacy of warnings in the manufacturing sector) that is expressly or impliedly reserved to Congress.

Federal preemption is derived from the Supremacy Clause of the U.S. Constitution, which provides:

This constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

Whether federal law preempts state action in a particular case is a question of congressional intent. *New Jersey State Chamber of Commerce v. Hughey* (3rd Cir.1985), 774 F.2d 587, 592. Federal preemption may be found if: (1) on the face of a federal law, Congress expressly stated an intent to preempt a state law; (2) the comprehensive and pervasive nature of the federal regulatory scheme indicates an implied intent to preempt state law; or (3) the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.; International Paper Co. v. Ouellette* (1987), 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883. Administrative regulations promulgated pursuant to congressional authorization have the same preemptive effect as federal statutes. *Fidelity Federal Savings & Loan Association v. de la Cuesta* (1982), 458 U.S. 141, 153–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664.

Federal Hazard Communication Standards (FHCS) were promulgated under the authority of the Occupational Health and Safety Act of 1970 (The OSH Act, or OSHA), 29 U.S.C.A. § 651 *et seq.* (1985), for the stated purpose of ensuring

that the hazards of all chemicals produced or imported are evaluated, and that information concerning their hazards is transmitted to employers and employees. This transmittal of information is to be accomplished by means of comprehensive hazard communication programs, which are to include container labeling and other forms or warning, material safety data sheets and employee training.

29 C.F.R. § 1920.1200(a)(1).

The FHCS further provides that:

This occupational safety and health standard is intended to address *comprehensively* the issue of evaluating the potential hazards of chemicals, and communicating information concerning hazards and appropriate protective measures to employees, *and to preempt any legal requirements of a state, or political subdivision of a state, pertaining to the subject* .... Under [29 U.S.C.A. § 667], *no state or political subdivision of a state may adopt or enforce, through any court or agency, any requirement relating to the issue addressed by this Federal standard, except pursuant to a Federally-approved state plan.*

29 C.F.R. § 1920.1200(a)(2) (emphasis added). This language would seem to indicate that strict liability and negligence claims predicated on a manufacturer's failure to provide adequate warnings have indeed been preempted by federal regulations.

One court facing a substantially similar question, however, came to the opposite result. In *Pedraza v. Shell Oil Co.* (1st Cir.1991), 942 F.2d 48, Cruz Pedraza filed a civil action alleging that he developed respiratory ailments from workplace exposure to epichlorohydrin (ECH), a toxic chemical manufactured by Shell Oil Company. Pedraza asserted various theories of negligence and strict liability, including allegations that Shell had failed to adequately warn of the dangers of exposure to ECH. The district court concluded that the OSH Act preempted Pedraza's failure to warn claims, but the First Circuit Court of Appeals reversed, holding that the OSH Act's "savings clause" evidences an intent to spare state tort laws from preemption. *Id.* at 53.

The OSH Act's preemption language is expressed in the following provision:

Nothing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under [29 U.S.C.A. § 655].

29 U.S.C.A. § 667(a). By negative implication, if a federal standard for a particular occupational safety or health issue is in effect under the OSH Act, a state court may not assume jurisdiction over such an issue. The preemptive effect of this section is, however, tempered by the following language from the savings clause of 29 U.S.C.A. § 653:

Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

29 U.S.C.A. § 653(b)(4).

The *Pedraza* court observed that there is a "solid consensus" that the savings clause

operates to save state tort rules from preemption. 942 F.2d at 53–54 (citations omitted).[4] *See* Note, *The Extent of OSHA Preemption of State Hazard Reporting Requirements*, 88 Colum.L.Rev. 630, 641 (1988) (savings clause indicates "Congress' explicit recognition of the continued validity of state worker compensation and tort remedies[.]"); Note, *Getting Away with Murder: Federal OSHA Preemption of State Criminal Prosecutions for Industrial Accidents*, 101 Harv.L.Rev. 535, 543 (1987) ("Indeed, [the savings clause] saves from preemption two forms of liability that, like criminal law, regulate workplace conduct and set implicit standards—state workers' compensation and tort law."). Thus, although none of the cases cited by the first circuit dealt with product liability claims, much less those based on failure to warn theories, we agree with the *Pedraza* court's holding that the savings clause operates to exempt tort law claims from preemption. Because we find that state tort actions are expressly saved by the OSH Act, we will not address whether such actions are impliedly preempted.[5]

## II. ADEQUACY OF WARNINGS

■ York next argues that a factual dispute exists regarding the adequacy of

---

**4.** The court in *Pedraza* further noted that the scant legislative history available on this issue evinces congressional intent to preserve state tort laws. The Solicitor of Labor, in a letter to the Chairman of the House Subcommittee on Labor, explained that OSHA "would in no way affect the present status of the law with regard to workmen's compensation legislation or *private tort actions*." 942 F.2d at 54 n. 8 (quoting Occupation Health and Safety Act of 1969: Hearings on H.R. 843, H.R. 3809, H.R. 4294, and H.R. 13373 before Select Subcommittee on Education and Labor, 91st Cong., 1st Sess., Pt. 2, at 1592–93 (letter of L.H. Silberman, Solicitor of Labor) (emphasis supplied by *Pedraza* court)).

**5.** Despite our holding on this issue, we find it somewhat problematic that a judgment in a state tort action will have the effect of establishing, at least implicitly, a standard for a manufacturer to follow in preparing warnings and instructions for a product. When addressing the state of Connecticut's tort laws in relation to OSHA, the *Pedraza* court opined:

Connecticut's accustomed maintenance of judicial fora for the enforcement of private rights in the workplace, under State laws of

general application, seems to us a function far less prophylactic than reactive; less normative than compensatory; and less an arrogation of regulatory jurisdiction over an "occupational safety or health issue" than a neutral forum for the orderly adjustment of private disputes between, among others, the users and suppliers of toxic substances.

942 F.2d at 53.

There can be no doubt that manufacturers in Indiana are held to the "standards" imposed by the Product Liability Act and its interpretation by the appellate courts of this state. In that sense, decisions of our appellate courts are prophylactic and normative. *See National Solid Wastes Management Association v. Killian* (7th Cir.1990), 918 F.2d 671, where Judge Easterbrook, in a concurring opinion, observed that rules of tort law are standards for purposes of auto safety law, in that damages induce firms to alter their behavior. It seems clear that the warning requirements imposed by a jury on a manufacturer in civil litigation could conflict with the warning requirements of the FCHS. However, until Congress modifies the savings clause of 29 U.S.C.A. § 653(b)(4), tort actions will survive preemption.

Union Carbide's warnings to the decedent of the potential dangers of argon gas. Union Carbide responds that the undisputed facts reveal that adequate warnings were given.

In Indiana, actions for strict liability in tort are governed by the Product Liability Act, IND.CODE 33–1–1.5–1 *et seq.* (1988). The provision imposing strict liability states in part:

(a) One who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to his property is subject to liability for physical harm caused by that product to the user or consumer or to his property if that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition, and if:

(1) The seller is engaged in the business of selling such a product; and

(2) The product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this chapter.

IC 33–1–1.5–3.

A product is considered defective if it is in a condition:

(1) Not contemplated by reasonable persons among those considered expected users or consumers of the product; and

(2) That will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

(b) A product is defective under this chapter if the seller fails to:

(1) Properly package or label the product to give reasonable warnings of danger about the product; or

(2) Give reasonably complete instructions on proper use of the product; when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer.

IC 33–1–1.5–2.5(b). York contends that these provisions require Union Carbide to provide warnings and instructions directly to USX personnel, and that Union Carbide could not rely on USX to disseminate the information to its employees.

York relies chiefly on two cases for the general proposition that a manufacturer's duty to warn of the dangerousness of a product is nondelegable. In the first, *Hoffman v. E.W. Bliss Co.* (1983), Ind., 448 N.E.2d 277, our supreme court addressed trial court instructions on a manufacturer's duty to warn. The court found that the jury was correctly instructed that a manufacturer must provide warnings that will reach the ultimate user or consumer. Noting that the product in *Hoffman* had a latent defect, and did not operate as either the manufacturer or the plaintiff's employer intended, the court further held that, where a latent design or manufacturing defect becomes operable, "the manufacturer can *never* delegate to a second party the duty to warn...." Thus, argues York, Union Carbide was required to personally inform the decedent of the dangers of argon gas.

This argument relies on the mistaken assumption that the argon gas supplied by Union Carbide has a manufacturing or design defect. Argon is a chemical element, one of the more than 100 substances that constitute all matter. Union Carbide merely extracts the argon from other elements and supplies it in bulk to USX and other customers via pipeline. There is absolutely no evidence to warrant the inference that the argon was defective or contaminated, or anything other than that which USX had ordered or Union Carbide supplied. A manufacturer is legally bound to design and build products which are reasonably safe for the purpose for which they are intended. *Liberty Mutual Insurance Co. v. Rich Ladder Co., Inc.* (1982), Ind.App., 441 N.E.2d 996, 998. It was never intended for argon gas to come into contact with USX personnel. Stated in terms of the Product Liability Act, the argon gas was not in a condition "not contemplated by reasonable persons among those considered expected users or consumers" of the prod-

uct, nor was it "unreasonably dangerous to the expected user or consumer *when used in reasonably expectable ways of handling or consumption.*" IC 33–1–1.5–2.5(a) (emphasis added). As a matter of law, the introduction of argon into the chamber at a time the vessel was shut down for repairs or maintenance was not a reasonably expected use of the product. Thus, the only manner in which argon could have been defective in this case, under Indiana's product liability law, is under the provision for a manufacturer's failure to warn, IC 33–1–1.5–2.5(b). *See Dias v. Daisy–Heddon* (1979), 180 Ind.App. 657, 662, 390 N.E.2d 222, 225, *trans. denied* (when warning is given, "the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is *not* in defective condition, *nor* is it unreasonably dangerous.") (quoting Restatement (Second) of Torts § 402A comment j (1965)).

The court in *Hoffman* noted that cases involving design and manufacturing defects are distinguishable from failure to warn cases; in the latter case, a manufacturer can fulfill its duty to warn by informing employees responsible for receiving and setting up the product of dangers associated with the use of the product. 448 N.E.2d at 286 (citing *Shanks v. A.F.E. Industries, Inc.* (1981), 275 Ind. 241, 416 N.E.2d 833, *reh'g denied*). This is so where, for instance, the product is one installed as a component of a multifaceted operation, and the manufacturer has no control over the work space, the instrumentality causing the injury or the hiring, instruction or placement of personnel. *See Hoffman, supra,* at 286; *Shanks, supra,* 416 N.E.2d at 836–38; *Burton v. L.O. Smith Foundry Products Co.* (7th Cir. 1976), 529 F.2d 108 (applying Indiana law). Thus, the manner of adequately warning employees in such a situation could be determined only *after* a given type of operation had been chosen and constructed. *Shanks, supra,* 416 N.E.2d at 838.

In *Burton,* the manufacturer (Smith) supplied a highly flammable liquid used in conjunction with molding machines at an International Harvester plant. While performing maintenance on one of the machines, a worker severed the hose dispensing the liquid to the machine, igniting the liquid and fatally burning another maintenance worker. Smith never warned Harvester employees of the volatile nature of the product, although the decedent and other workers knew the liquid was flammable. In affirming the grant of summary judgment in favor of Smith, the Seventh Circuit Court of Appeals concluded that, if a duty to warn existed,

> it was to warn the International Harvester employees who were responsible for receiving the parting concentrate, mixing it with kerosene, and using it, that the final mixture was highly flammable. Since Smith itself had no control over the molding machine or the surrounding work space, it was International Harvester, through these personnel, who would have to post warnings or take other precautions.

> *       *       *       *       *       *

> Smith's duty was only to make known, *to those International Harvester employees to whom it had access,* properties of its product that were dangerous and nonobvious.

529 F.2d at 111–12 (emphasis added).

Similarly, in *Shanks,* the court did not impose a duty upon the manufacturer to personally warn the ultimate user. The product, an automatic grain dryer, was capable of being incorporated into a variety of grain handling systems, and the manufacturer had no way of knowing how the dryer would be used. Therefore, the employer who designed the overall system had the duty to warn its employees. 416 N.E.2d at 837.

York also relies heavily on *Jarrell v. Monsanto Co.* (1988), Ind.App., 528 N.E.2d 1158, *trans. denied* (1990), Ind., 555 N.E.2d 453, where the court concluded that the duty to warn was nondelegable. In *Jarrell,* the manufacturer supplied bags of sulphur to the plaintiff's employer. On one occasion, when the plaintiff emptied two fifty-pound bags of sulphur into a bin, sul-

phur dust accumulated in the air and somehow ignited, seriously injuring the plaintiff. The manufacturer attached warnings to the bags of sulphur cautioning against creating dust while handling, and informing the user that the dust was easily ignited. The court found that *Shanks* was not dispositive on the duty to warn issue, observing: "Our case involves no complex machinery—only bags of sulphur which [the manufacturer] knew would have to be opened and dumped to be used." *Jarrell, supra,* 528 N.E.2d at 1165.

On the other hand, this case does involve complex machinery. It further involves a material, delivered in bulk via pipeline, to which no label could conceivably be affixed. Moreover, Union Carbide supplied a product that was merely a component in a larger, more complicated system designed, installed and maintained by USX.[6] Union Carbide had no control over the steel-making process of USX or the system that delivered argon gas to each furnace. Thus, this case is far more analogous to *Shanks* and *Burton* than to *Hoffman* and *Jarrell.* Union Carbide was not required to directly warn all employees of USX; once it discharged its duty to warn those receiving the product Union Carbide was legally entitled to rely on USX to warn those workers reasonably expected to come into contact with the product.

We do not agree with York's contention that our holding allows manufacturers to exculpate themselves from liability merely by claiming that they have no control over their product once it is shipped. This is not the case in this or any other situation.[7]

The standard under the Product Liability Act still requires reasonable warnings and reasonably complete instructions on the product's use. IC 33–1–1.5–2.5. In an action based on the negligent failure to warn, when the warnings are given to an employer (or other third parties), "[t]he question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it." Restatement (Second) of Torts § 388 comment n (1965). Thus, adequacy of the warnings remains at issue, and Union Carbide could still be found liable if it provided inadequate warnings to those USX personnel responsible for receiving the product and disseminating the information to co-workers.

■ "The adequacy of warnings is classically a question of fact reserved to the trier of fact and, therefore, usually an inappropriate matter for summary judgement." *Jarrell, supra,* 528 N.E.2d at 1162. In support of its claim that summary judgment was appropriate in this instance, Union Carbide underscores the more than 100 occasions on which they supplied USX with a booklet entitled "Safety Precautions." Union Carbide placed a notice on the front page of this booklet, reading in part:

> NOTICE Make certain that the information contained in this booklet and in the gas equipment manufacturer's operating instructions reaches each person who may use or come in contact with the products covered herein. These products are for use by trained personnel only.

6. York argues that Union Carbide had a duty to participate in the design of USX's argon delivery system. In her reply brief, York states that "it is an industry practice within the compressed gas industry to provide instructions and training on proper use and handling of the gas at every step." York cites the affidavit of Bernard Emdres, which actually states: "Other manufacturers of hazardous gases have furnished qualified technical representatives and training aids to train personnel in every step required in handling these hazardous gases." Record, p. 182. We cannot agree that these statements lead to the reasonable inference that Union Carbide had any duty to design, install, or maintain complicated pipelines for an independent company. This argument has no foundation in the law.

7. We use the term "delegable" in the sense that a manufacturer can, in some cases, provide adequate warnings to a third party such as an employer, and instruct that these warnings be given to those reasonably expected to come into contact with the product. In the sense that the word "delegable" refers to a manufacturer's intent to shift the entire duty to warn to the third party (including the formulation of adequate warnings), this duty would, of course, not be delegable. The duty to provide adequate warnings remains, in the first instance, with the manufacturer.

Exhibit 2, Tab 39. One of the products covered therein is argon.

The information pertaining to argon includes the following:

> Nitrogen, argon, helium, and carbon dioxide are inert, colorless, odorless, and tasteless gases.
>
> \* \* \* \* \* \*
>
> ### WARNING
>
> ... argon .... can cause rapid asphyxiation and death in confined, poorly ventilated areas.
>
> \* \* \* \* \* \*
>
> Keep Equipment Area Well Ventilated
>
> ... argon [is] non-toxic, but ... can cause rapid asphyxiation in a confined area that does not have adequate ventilation. Any atmosphere which does not contain enough oxygen for breathing (at least 18 percent) can cause dizziness, unconsciousness, or even death. When there is doubt about the adequacy of ventilation, use an oxygen analyzer with a 0 to 25% scale to check for oxygen.
>
> \* \* \* \* \* \*
>
> ... argon ... cannot be detected by the human senses and will be inhaled like air. If adequate ventilation is not provided, these gases may displace normal air without warning that a life-depriving atmosphere is developing.... Never enter any tank, pit or other confined area where these gases may be present until purged with air and tested for a breathable atmosphere (at least 18 percent oxygen) using a gas analyzer.

*Id.* at pp. 4–5.

In addition, Union Carbide provided USX with Material Safety Data Sheets (MSDS) for argon, as required by OSHA under the Hazard Communication Standards. *See* Issue I, *supra.* The MSDS for argon states that argon is a "simple asphyxiant" that is "colorless" and "odorless" at normal temperature and pressure. This publication further states: "This gas is an asphyxiant. Moderate concentrations can cause headache, drowsiness, dizziness and unconsciousness. Lack of oxygen can cause death." Exhibit 2, Tab 44. Under the heading "SPILL OR LEAK PROCEDURES" the MSDS states:

> ### STEPS TO BE TAKEN IF MATERIAL IS RELEASED OR SPILLED
>
> Argon is an asphyxiant. Evacuate all personnel from danger area. Use self contained breathing apparatus where needed.... Ventilate area of leak.... Test area, especially confined areas, for sufficient oxygen content prior to permitting re-entry of personnel.

*Id.* at p. 3.

On the first page of the MSDS, this notice is included:

> Union Carbide requests the users of this product to study this Material Safety Data Sheet (MSDS) and become aware of product hazards and safety information. To promote safe use of this product a user should ... notify its employees, agents and contractors of the information on this MSDS and any product hazards and safety information....

*Id.* at p. 1.[8]

York contends that these warnings did not sufficiently apprise USX personnel of

---

**8.** In her reply brief York makes the belated assertion that the safety precautions booklets and MSDS's were inadmissible hearsay and not appropriate for consideration as evidence at the summary judgment proceeding. After the reply brief was filed, Union Carbide filed a motion to strike this argument as waived for York's failure to object to the exhibits when presented to the court in support of the summary judgment motion. Union Carbide also notes that York failed to include this argument in her original appellant's brief. While waiver is certainly appropriate in this instance, *see, e.g., Paramo v. Edwards* (1990), Ind., 563 N.E.2d 595, we need not rely on the waiver doctrine to consider the ques-

tioned materials, because the statements included in the warning materials are not hearsay.

A statement made out of court is objectionable as hearsay only when it is offered in court to prove the truth of the matter asserted therein, so that its value depends upon the credibility of the out-of-court asserter. *Consolidated Rail Corp. v. Thomas* (1984), Ind.App., 463 N.E.2d 315. The warnings in this case were not offered to prove, for instance, that argon is an asphyxiant, or that argon should be used only in well-ventilated areas. The parties do not dispute the characteristics of the product. The materials were offered to prove that warnings were given. For this reason, Union Carbide's motion to

the dangerous properties of argon gas, and that there were numerous things that Union Carbide could have done to improve USX's knowledge of these hazards. According to York, Union Carbide should have informed USX personnel of four separate incidents in which workers were either killed or injured from argon gas asphyxiation. However, this would obviously not improve USX's knowledge that argon is an asphyxiant—it would merely confirm something already known to USX personnel. Moreover, according to the accident report filed by USX personnel just five days after the accident, USX was aware that fatalities occurred in a similar accident at another facility in 1981.

■ York makes much of the fact that it was feasible for Union Carbide to odorize the argon gas so that workers could detect its presence. However, it is undisputed that USX did not want to purchase odorized gas, and would not have purchased odorized gas from any source, due to the impurities in the steel that would result. Moreover, the Staff Supervisor for Safety and Security at USX, John Longfellow, opined that odorizing argon gas would be "a very dangerous practice" because a worker may not be able to distinguish the odorant used in explosive gases such as natural gas and propane from that used in an inert gas such as nitrogen or argon. Longfellow concluded that he would not recommend odorizing the gas. Exhibit 20, pp. 108–09. Regardless of feasibility, the lack of an odorant does not have any relevance to Union Carbide's duty to provide an adequate warning for the product it ultimately delivered in this case. As the feasibility of odorization does not facilitate the resolution of the only issue remaining in this case, we must conclude that any factual dispute in this regard is not "material" for the purposes of a summary judgment motion. *Havert, supra,* 452 N.E.2d at 156–57.

Furthermore, it is highly speculative whether an odorant could have prevented

strike York's argument is denied. Union Carbide's motion to strike is denied in all other

the rapid asphyxiation that occurred in this case. York may not rely on mere possibilities to overcome summary judgment. "[W]hen the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Welch v. Railroad Crossing, Inc.* (1986), Ind.App., 488 N.E.2d 383, 391 (citing W. Prosser, Handbook of the Law of Torts § 41, at 241 (4th ed. 1971)). *See also Shanks, supra,* 416 N.E.2d at 838 (to allow a jury to examine, in retrospect, the wisdom of the manufacturer's incorporating a warning device in the product is to permit nothing more than speculation).

■ York also argues that Union Carbide was obligated to fully train USX technicians on the proper method of testing a confined space for oxygen deficiency, citing to the Product Liability Act requirement that the manufacturer give "reasonably complete instructions on proper use of the product." IC 33–1–1.5–2.5(b)(2). However, the "product" in this case is the argon gas; Union Carbide did not supply the gas testing equipment as York implies. Moreover, as Union Carbide points out, York offers no authority for the proposition that a manufacturer has a legal duty to train the employees of its buyers. Finally, it is undisputed that USX in fact instructed their technicians to take a reading in the normal breathing zone of five to six feet above the floor of the Evelyn vessel. The evidence leads solely to the conclusion that USX trained and certified gas testers took an oxygen reading from above the normal breathing zone. These facts have no bearing on Union Carbide's duty to warn.

It is apparent that there is no information Union Carbide could have added to increase USX's knowledge of the characteristics of argon gas. That USX knew of this information is beyond dispute. USX instituted a "Confined Space Hazardous Area Safety Training Program" to warn employees of the dangers of argon and other gases. Michael York and Costas Lal-

respects as well.

ios both received this training; York in 1979, and Lalios only six months before the accident. In addition to this training, workers were instructed in standardized safe job procedures (SJP), including one for opening or entering pits. In February of 1984 USX issued an SJP, designated SJP I–5, to instruct employees on the dangers of entering confined spaces such as "bop vessels" where hazardous concentrations of gas may exist. SJP I–5 defines the following procedures and hazards:

> 1.1 CONFINED SPACE is any enclosed area which has little or no air movement/ventilation, limited means of entrance or exit, and an area not intended for continuous employee occupancy that could present an immediate or potentially dangerous condition to life or health due to one or more of the following: oxygen enrichment or deficiency....

> \* \* \* \* \* \*

> 3.1 Secure approval of the Operating Supervisor for the specific spaces to be entered.

> ### HAZARDS

> 3.1 Asphyxiation by toxic gases or lack of oxygen....

> 4.1 Take atmospheric tests required to process ENTRY PERMIT. Certified Gas Tester will record test results and instruments used on the ENTRY PERMIT.

> ### [HAZARDS]

> 4.1 Insufficient tests. Improper test procedures.

> \* \* \* \* \* \*

> 4.3 A Certified Gas Tester must take all atmospheric gas tests.

> ### [HAZARDS]

> 4.3 Wrong tests. Inaccurate tests.

Exhibit 2, Tab 23.

In the 1983 edition of USX's "Safety Rules" employees are advised to "be alert to the high volumes of oxygen, nitrogen and other gases used in BOP shops. Valves on these lines must be securely locked out and blanks installed when working on lines or vessels." Exhibit 2, Tab 21, p. 10. The rules further state: "When working on vessels, multiple switches and valves have to be locked out and lines blanked off, depending on work to be done." *Id.*

USX's specifications for argon piping issued in 1982 states:

> ### PERSONNEL SAFETY

> When argon is piped to a confined space or vessel which personnel may be required to enter, the argon supply piping shall be provided with positive shut-off as described below to preclude possibility of personnel being exposed to an oxygen-deficient atmosphere.

Exhibit 2, Tab 48, p. 4. The designer of the piping system advised USX personnel that the hoses supplying argon to the vessel must be disconnected while people work inside it.

It is clear that USX had a great deal of knowledge concerning the effect of argon gas in a confined space. Thus, as in *Shanks, supra,* no additional warning or literature that could be furnished to USX by Union Carbide could have improved upon USX's understanding of the characteristics of the product. *See id.* 416 N.E.2d at 837 (quoting opinion of court of appeals, 403 N.E.2d 849, 857). Because York does not raise a material issue of fact in this regard, we must conclude that the warnings issued by Union Carbide were adequate as a matter of law.

The trial court is affirmed.

GARRARD and MILLER, JJ., concur.