**John W. BAKER, et al., Plaintiffs,**

v.

**MONSANTO COMPANY, Defendant.**

**No. IP 91–626–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 9, 1997.

---

David S. McCrea, McCrea & McCrea, Bloomington, IN, Paul E. Merrell, Eugene, OR, C. Joseph Murray, The Murray Law Firm, New Orleans, LA, for Plaintiff.

Michael R. Fruehwald, Barnes & Thornburg, Indianapolis, IN, for Defendant.

### *ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT*

BARKER, Chief Judge.

This case is presently before this court on Defendant Monsanto Company's ("Monsanto") motion for summary judgment on Plaintiffs', Johnnie Taylor (Taylor) and Richard Sluder (Sluder), claims of tortious failure to warn and fraud. Defendant also moves for summary judgment on Sluder's claim of battery. Sluder's wife is also a party in this lawsuit; she asserts a loss of consortium claim, derivative of her husband's claims against Monsanto. In response to Monsanto's motion for summary judgment, Plaintiffs voluntarily withdrew their claims of conspiracy, and Taylor withdrew his claim of battery. Thus, presently before this court is Monsanto's motion for full summary judgment, as well as Plaintiffs' motion for partial summary judgment on the claims of negligence and strict liability. For the reasons set forth below, Monsanto's motion for summary judgment on all of the remaining claims is **GRANTED,** and Plaintiffs' motion for partial summary judgment is **DENIED.**

### I. *STATEMENT OF FACTS*

The history of polychlorinated biphenyl (PCB) usage in this country is now both well-known and well documented. Monsanto was the sole producer of PCBs in the United States. It developed PCBs in the late 1920s and 1930s as a dielectric fluid alternative to mineral oil. Mineral oil is highly flammable; PCBs are fire-resistant and do not support combustion. Thus, PCBs were a welcome innovation to electrical equipment manufacturers, such as Westinghouse Electric, Plaintiffs' employer. In fact, starting in 1921, Westinghouse, itself, sought to develop a non-flammable alternative to mineral oil.

From 1935 to 1977, Monsanto manufactured and sold its dielectric fluids containing PCBs for use as an insulating fluid inside electrical equipment according to the specifications of the equipment manufacturers. The dielectric fluids had different chemical properties and were referred to by Monsanto as askeral fluids or "Aroclors." Westinghouse established product specifications for the dielectric fluids it purchased from Monsanto and gave those fluids the trade name "Inerteen."

In the 1970s, the federal government banned the use of PCBs because of environmental and human hazards associated with their use.

Taylor was a Westinghouse employee in Muncie, Indiana from July 1974 until December 1976. Sluder worked for Westinghouse in its Bloomington, Indiana plant from March 1972 to December 1993. It is undisputed that Monsanto sold Inerteen to Westinghouse for use in its Bloomington plant and that Inerteen was in use there through 1977. Although Monsanto did not sell any of its PCB fluids to Westinghouse for use in its Muncie plant, Taylor maintains that he was exposed to PCBs when he came into contact with PCB transformers sent to Muncie for repairs.

## II. *LEGAL ANALYSIS*

### A. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist Med'l Ctr. v. American Med'l Sec., Inc.*, 38 F.3d 316, 319 (7th Cir.1994).

On a *motion for summary judgment*, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265`(1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movants to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movants. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

Nevertheless, only issues of fact that could affect the outcome of a case are "genuine" such that they may save a case from summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir.1994). A court cannot "ignore facts in the record merely because they are unfavorable.... [A non-movant] gets the benefit of the doubt only if the record contains competent evidence on both sides of a factual question." *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 366 (7th Cir.1997). And, of course, speculation alone cannot create issues of genuine fact. *Hedberg v. Indiana Bell Tele. Co.*, 47 F.3d 928, 931–32 (7th Cir.1995). Thus, if it is clear that a plaintiff will be unable to satisfy the legal obligations required of him to establish his case, summary judgment is not only appropriate, but also required. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989).

### B. *DUTY TO WARN CLAIMS*

Plaintiffs move for summary judgment on both their strict liability and negligence claims, based on Monsanto's alleged breach of its duty to warn of the dangers of PCBs.

Defendant also moves for summary judgment on these claims.

Plaintiffs maintain that Monsanto had a duty to warn both Taylor and Sluder of the PCBs in the products it supplied to Westinghouse. They maintain that this duty is nondelegable and that Monsanto breached its duty by failing to inform Plaintiffs of the known dangers posed to them by PCBs. Plaintiffs also maintain that even if the duty is found to be delegable, Monsanto failed to discharge that duty by failing to inform Westinghouse of the known dangers PCBs posed to humans and by affirmatively misleading Westinghouse about the health risks posed by PCBs. Monsanto maintains that Westinghouse was a knowledgeable and sophisticated bulk purchaser of the fluids which contained PCBs and that Westinghouse was fully informed of the dangers posed by PCBs. Monsanto points out that it sold its products to Westinghouse in fifty-five gallon barrels that bore labels warning of the dangers associated with the use of the Monsanto fluids. Monsanto contends there was no possible way for it to have labeled the liquids directly, and further, it had no control over the products it sold to Westinghouse at the Westinghouse locations or the instruction of Westinghouse personnel in the handling of the oils. It directs this court to a handful of decisions (none from Indiana) where courts have expressly applied the doctrine of the sophisticated and knowledgeable bulk purchaser as a defense to failure to warn claims. *See* Defendant's Br. In Support of Motion for Summary Judgment, at 17–18 (citing cases).

 Under Indiana law, a plaintiff can recover in a products liability suit if he can demonstrate that the product which allegedly caused his injury is defective. IC 33–1–1.5–1 et seq. (1988). The defect can be established if "the product was defectively designed, defectively manufactured, or that the manufacturer failed to supply adequate warnings or instructions as to the dangers associated with its use." *Hoffman v. E.W. Bliss Co.,* 448 N.E.2d 277, 281 (Ind.1983). Thus, a product

can be flawlessly designed, yet still be deemed defective by virtue of a manufacturer's failure to warn adequately of the dangers involved in the use of the product. *Shanks v. A.F.E. Indus.,* 275 Ind. 241, 416 N.E.2d 833, 837 (1981); *Jarrell v. Monsanto Co.,* 528 N.E.2d 1158, 1166 (Ind.App.1988), *trans. denied,* 555 N.E.2d 453 (Ind.1990); *Reliance Ins. Co. v. AL E. & C. Ltd.,* 539 F.2d 1101, 1106 (7th Cir.1976) (applying Indiana law); *Nissen Trampoline Co. v. Terre Haute First Nat'l Bank,* 332 N.E.2d 820, 825 (Ind.App.1975), *rvs'd on other grounds,* 265 Ind. 457, 358 N.E.2d 974 (1976).

> It is clear [that] the manufacturer can never delegate to a second party the duty to warn of the presence of a latent defect and the potential danger in use of the product should the defect become effectively operable.

*Hoffman,* 448 N.E.2d at 286; *York v. Union Carbide Corp.,* 586 N.E.2d 861, 867–68 (Ind. App.1992).

 Plaintiffs here do not maintain that Monsanto's PCB fluids were defectively designed or manufactured; they maintain that Monsanto failed to warn them of the dangers associated with the use of PCBs and that, as a result of this failure, the products were defective. When the defect being complained of is the failure to warn adequately, Indiana courts, as well as federal courts construing Indiana law, have consistently held that a manufacturer's duty to warn the ultimate user of its product may be delegated by adequately warning a third party. *See, e.g., Burton v. L.O. Smith Foundry Products,* 529 F.2d 108, 111 (7th Cir.1976) (applying Indiana law) (finding that supplier's duty to warn of unknown dangers extended only to those employees of purchaser "to whom it had access," not to ultimate users); *Hoffman,* 448 N.E.2d at 286; *Shanks,* 416 N.E.2d at 837–38.[1]

Plaintiffs rely on *Jarrell v. Monsanto* for the proposition that a manufacturer's duty to warn is never delegable. 528 N.E.2d at 1158.

---

1. Although Indiana courts refer to the duty to warn as "delegable" under certain circumstances, they have never completely relieved a manufacturer of a duty to warn. "The duty to provide adequate warnings remains, in the first instance, with the manufacturer." *York,* 586 N.E.2d at 869 n. 7. Thus, a manufacturer may never delegate its duty to warn a user of its product to a third party in such a way that relieves it altogether of its duty.

In *Jarrell*, the manufacturer supplied fifty-pound bags of sulphur to the plaintiff's employer. The manufacturer attached labels to the bags warning against "creating dust in handling" and informing the user that "sulphur dust suspended in air ignites easily." *Jarrell*, 528 N.E.2d at 1161. The sulphur ignited when the plaintiff emptied a bag into a storage bin at his employer's plant causing the plaintiff to suffer extensive burns. 528 N.E.2d at 1160.

No latent defect was alleged in *Jarrell*, and the court twice declared that the duty to warn is nondelegable. *Jarrell*, 528 N.E.2d at 1164–65. Nonetheless, for two reasons, we believe this specific holding is not a correct application of Indiana law.

First, in both instances where the *Jarrell* court stated that a manufacturer's duty to warn is nondelegable, it specifically cited the Indiana Supreme Court's decision in *Hoffman v. E.W. Bliss Company*, 448 N.E.2d 277 (Ind.1983). *Jarrell*, 528 N.E.2d at 1164 & 1165. Yet, in *Hoffman*, the Court held that a manufacturer "can never delegate to a second party the duty to warn *of the presence of a latent defect and the potential danger in use of the product should the defect become effectively operable.*" *Hoffman*, 448 N.E.2d at 286 (emphasis added). Furthermore, the Supreme Court specifically affirmed its reasoning in an earlier case in which the manufacturer's duty was discharged where "the manufacturer had no control over the work space, the hiring, instruction or placement of personnel, and the manner of integration of the product into the employer's operation." *Hoffman,* 448 N.E.2d at 286 (discussing *Shanks*, 416 N.E.2d 833). Under those circumstances, the Court wrote:

> the manufacturer's duty to warn [ultimate users] was . . . fulfilled when he warned the employees of the employer who were responsible for receiving and setting up the product of dangers associated with the use of the product.

*Hoffman*, 448 N.E.2d at 286 (affirming its reasoning in *Shanks*, 416 N.E.2d 833).

Thus, *Hoffman* clearly does not stand for the proposition that a manufacturer's duty to warn ultimate users is never delegable; in fact, it expressly states that, under appropriate circumstances, it may be.

There is a second reason that this court declines to adopt Plaintiffs' interpretation of Indiana law, as set out in *Jarrell*. Notwithstanding that the Court of Appeals in *Jarrell* states that a manufacturer's duty to warn is not delegable to a third party such as a purchaser-employer, the court proceeded to discuss whether the manufacturer's warnings to the purchaser-employer were adequate. Drawing on factors outlined in the Restatement (Second) of Torts § 388 comment "n" (1965), the *Jarrell* court referenced such things as:

> the dangerous nature of the product, the form in which the product is used, the intensity and form of the warnings given, the burdens to be imposed by requiring warnings, and the likelihood that the particular warning will be adequately communicated to those who will foreseeably use the product.

*Jarrell*, 528 N.E.2d at 1164 (quoting *Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174, 179 (3d Cir.1976)). The court was particularly influenced by the fact that there was a genuine issue regarding whether the "bags of sulphur which [the manufacturer] knew would have to be opened and dumped to be used," *Jarrell*, 528 N.E.2d at 1165, were labeled adequately in light of the fact that the manufacturer had access to the handlers of the bags through warning labels. Significantly, the court noted "the lack of specificity of the warning in comparison to the nature of the harm." *Jarrell*, 528 N.E.2d at 1163. Thus, the manufacturer's duty to warn was not satisfied where it warned the purchaser of the risks associated with the use of sulphur, but did "not accommodate the danger at issue because the warnings were still inadequate to the risk which [the plaintiff] faced." *Jarrell*, 528 N.E.2d at 1165. Under these circumstances, the court held that it was unreasonable for the manufacturer to rely on a third-party employer to warn ultimate users of the danger of the product when its ability to warn them directly of a significant harm was unrestricted.

■ For these reasons, *Jarrell* cannot be considered a correct application of Indiana

law when it states that a manufacturer may never delegate its duty to warn ultimate users of a product to a third party. Under some circumstances, Indiana law permits a manufacturer to discharge its duty to warn by relying upon a third party to warn ultimate users, such as where the purchaser of a product is a "knowledgeable and sophisticated bulk purchaser." In those instances, a manufacturer may discharge its duty to the user of its product by relying on the purchaser to communicate the dangers associated with the product. As its name implies, the doctrine permits a manufacturer to rely on a knowledgeable, sophisticated bulk purchaser to warn ultimate users of the dangers associated with that product.

While no Indiana court has expressly adopted the knowledgeable and sophisticated bulk purchaser defense, urged upon us by Monsanto, as an absolute defense to the tortious failure to warn claims, Plaintiffs have not questioned its availability under Indiana law. Nevertheless, a discussion of the significant Indiana cases permitting manufacturers to discharge their duty to warn by relying on third parties is appropriate in order to determine whether Indiana courts would apply the knowledgeable, sophisticated bulk purchaser defense, if they had been presented with the issue.

In *Shanks*, discussed *supra*, plaintiff sued the manufacturer of an automatic grain dryer after an elevator leg, subsequently attached to the grain dryer, was activated, thereby permanently injuring the plaintiff. 416 N.E.2d at 833–34. Plaintiff asserted a strict liability, failure to warn claim against the manufacturer of the grain dryer. The Indiana Supreme Court noted that "the dryer operated exactly as it was intended to operate.... No manufacturing flaw is involved, nor is there a design flaw involved as to the dryer's operating characteristics." *Shanks*, 416 N.E.2d at 837. The court stated that, because the employer-purchaser of the grain dryer "was not ignorant of any of the facts concerning the operations and dangers inherent in the functions of the dryer" and because the manufacturer "had no control over the work space, the machine or the hiring, instruction or placement of person-

nel," its duty to warn the plaintiff was satisfied. "No additional warning or literature that could be furnished to [the purchaser of the dryer] by [the manufacturer] at the time of the sale could have improved upon his understanding of the characteristics of the machine." *Shanks*, 416 N.E.2d at 837–38. *See also Hoffman, supra*, 448 N.E.2d at 286 (discussing *Shanks* ).

In *Burton v. L.O. Smith Foundry Products Company*, the supplier of a kerosene mixture was sued for strict liability in tort after an employee of the purchaser suffered fatal burns when the kerosene ignited. 529 F.2d 108, 110 (7th Cir.1976) (applying Indiana law). The purchaser of the kerosene had used the manufacturer's product for thirty years and was well aware, as was the employee, that the kerosene was highly flammable. *Burton*, 529 F.2d at 110 & 111. The court stated that because the supplier "had no control over the [kerosene-infused] machine or the surrounding work space," any duty it may have had to warn of the dangers associated with the kerosene would be discharged after it warned the purchaser, who, in turn, would be responsible "to post warnings or take other precautions" for the ultimate user. *Burton*, 529 F.2d at 111. The court determined that no duty existed because the dangers involved in the use of kerosene were open and obvious:

> [The supplier's] duty was only to make known, to those [of the purchaser's] employees to whom it had access, properties of its product that were dangerous but nonobvious.

*Burton*, 529 F.2d at 111–12.

Most recently, in *York v. Union Carbide Corporation*, the Indiana Court of Appeals held that a supplier of argon gas discharged its duty to warn, under both theories of negligence and strict liability in tort, to employees working with the gas when it adequately informed the purchaser-employer of the dangers. 586 N.E.2d at 867–69. The court noted that the gas was delivered in bulk to the purchaser and could not be labeled directly. 586 N.E.2d at 869. It stated that the gas was "merely a component in a larger, more complicated system designed, installed and maintained by [the purchaser-

employer]" and that the manufacturer had no control over the gas-infused systems at the purchaser's site nor over the system that delivered the gas to each furnace. *Id.* For these reasons, the court found that the manufacturer:

> was not required to directly warn all employees of [the purchaser]; once it discharged its duty to warn those receiving the product[,] Union Carbide was legally entitled to rely on [the purchaser] to warn those workers reasonably expected to come into contact with the product.

*York,* 586 N.E.2d at 869. Regarding the adequacy of the warnings, as stated *supra,* the court emphasized that "[t]he duty to provide adequate warnings remains, in the first instance, with the manufacturer." *Id.* at 869 n. 7. However, it determined that the warnings given by the manufacturer were, indeed, adequate because it was "apparent that there [was] no information Union Carbide could have added to increase [the purchaser's] knowledge of the characteristics of argon gas" and because it was "clear that [the purchaser] had a great deal of knowledge concerning the effect of argon gas in a confined space. Thus, no additional warning or literature that could be furnished to [the purchaser] by [the manufacturer] could have improved upon [the purchaser's] understanding of the characteristics of the product." *Id.* at 871–72.

Thus, it is clear that where Indiana courts, and courts applying Indiana law, have found that a manufacturer's duty to warn the ultimate user of the harms associated with that product may be discharged by relying on a third party, they have emphasized the third party's knowledge, control over the environment in which the product is used, and the extent to which the manufacturer could have labeled the product to warn of the danger. These are all considerations invoked in the "knowledgeable and sophisticated bulk purchaser" defense.

The knowledgeable and sophisticated bulk purchaser defense is derived from comments "l" and "n" to the Restatement (Second) Torts § 388. Section 388, entitled "Chattel Known to be Dangerous for Intended Use," provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) Torts, § 388 (1965).

Section 388, Comment "l" provides:

The supplier's duty is to exercise reasonable care to inform those for whose use the article is supplied of dangers which are peculiarly within his knowledge. If he has done so, he is not subject to liability, even though the information never reaches those for whose use the chattel is supplied. The factors which determine whether the supplier exercises reasonable care by giving this information to third persons through whom the chattel is supplied for the use of others, are stated in Comment n.

Section 388, Comment "n," entitled "Warnings given to third person," provides:

Chattels are often supplied for the use of others, although the chattels or the permission to use them are not given directly to those for whose use they are supplied.... In all such cases the question may arise as to whether the person supplying the chattel is exercising that reasonable care, which he owes to those who are to use it, by informing the third person through whom the chattel is supplied of its actual character.

Comment "n" also contains a discussion of the factors to be considered in determining whether it is reasonable to rely upon a third

party to discharge the duty to warn the ultimate user. Those factors include:

(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users.

*Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 557 (W.D.Va.1984), *aff'd sub nom, Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985); *see also Smith v. Walter C. Best, Inc.*, 927 F.2d 736, 739–40 (3d Cir.1990) (same); *In re TMJ Implants Prods. Liability Litig.*, 872 F.Supp. 1019, 1028 (D.Minn.1995) (same), *aff'd*, 97 F.3d 1050 (8th Cir.1996); *see also Jarrell, supra*, 528 N.E.2d at 1164.

Indiana's Supreme Court has applied the duty to warn as described in Section 388 to both negligence and strict liability claims of failure to warn, as have other courts applying Indiana law. *American Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 187 & 188 (Ind. 1983); *see also Black v. Henry Pratt Co.*, 778 F.2d 1278, 1283 (7th Cir.1985) (holding that where manufacturer had no duty to warn as delineated by Section 388, it could not be liable under Indiana's product liability laws); *Zepik v. Ceeco Pool & Supply Inc.*, 637 F.Supp. 444, 448 (N.D.Ind.1986) (construing duty to warn as defined in Section 388 for purposes of both negligence and strict liability claims); *Ortho Pharmaceutical Corp. v. Chapman*, 180 Ind.App. 33, 388 N.E.2d 541, 552–53 (1979) (finding that negligence standard of duty to warn, as described in Section 388, "as a practical matter" determines what constitutes adequate warnings under Indiana's product liability law).

■ Thus, it is not difficult to conclude that, given the opportunity, an Indiana court would likely apply the factors that animate the knowledgeable, sophisticated bulk purchaser defense in cases of negligence and strict liability duty to warn, thereby permitting a manufacturer reasonably to rely on an intermediary purchaser to warn ultimate users of dangers associated with the use of a product. Indiana courts have permitted del-

egation where the purchaser was equally knowledgeable of a product's dangers, *Shanks*, 416 N.E.2d at 837–38; *Burton*, 529 F.2d at 111–12; *York*, 586 N.E.2d at 871–72, where it would be impossible for a manufacturer to access all ultimate users of a product because it had no control over the site of usage, *Hoffman*, 448 N.E.2d at 286; *Shanks*, 416 N.E.2d at 837–38; *Burton*, 529 F.2d at 111; *York*, 586 N.E.2d at 869, and the form of the product prohibited direct labeling, *York*, 586 N.E.2d at 869. In addition, one Indiana decision holds that it was unreasonable for a manufacturer to rely on a third-party purchaser to warn ultimate users of dangers associated with the product where the manufacturer had access to ultimate users of the product through warning labels which failed to communicate adequately the nature of the risk involved with the product. *Jarrell*, 528 N.E.2d at 1163–65. In that case, the manufacturer's burden to directly discharge its duty to warn ultimate users of the product was not outweighed by other factors and, thus, it was deemed unreasonable to rely on a third-party to warn ultimate users. *Id.* These are the precise considerations balanced under Section 388 and the knowledgeable, sophisticated bulk purchaser defense. However, it remains unclear whether the doctrine would be adopted as an absolute bar to liability under all circumstances, as urged by Monsanto. Section 388 specifically contemplates a balancing of factors, and, even in *York*, the Indiana case which comes closest to recognizing the doctrine, the court is careful to point out that the mere fact of a knowledgeable, sophisticated bulk purchaser does not automatically relieve a manufacturer of its duty to warn. *York*, 586 N.E.2d at 869 n. 7 ("The duty to provide adequate warnings remains, in the first instance, with the manufacturer.").

Therefore, although we believe that the knowledgeable, sophisticated bulk purchaser defense is viable in Indiana, we decline to hold that where a manufacturer relies on a knowledgeable, sophisticated bulk purchaser to warn ultimate users of dangers associated with its product, the manufacturer is automatically insulated from liability. Instead, as we have now established, a balancing of fac-

tors is required and because, "it is obviously impossible to state in advance any set of rules which will automatically determine in all cases whether one supplying a chattel for the use of others through a third person has satisfied his duty to those who are to use the chattel by informing the third person of the dangerous character of the chattel, or of the precautions which must be exercised in using it in order to make its use safe" (Section 388, comment "n"), each case must be examined on its own terms. Accordingly, we turn now to consider whether, under the circumstances, it was reasonable for Monsanto to rely on Westinghouse to warn Westinghouse employees of the dangers associated with the Monsanto products and whether Monsanto's warnings to Westinghouse were adequate.

■ Westinghouse was a knowledgeable purchaser of Monsanto products. Plaintiffs themselves acknowledge Westinghouse's longstanding and extensive knowledge of the dangers associated with Monsanto products. *See, e.g.,* Plaintiffs' Second Amended Complaint ¶¶ 16 (alleging that Westinghouse "know[s] and ha[s] known for at least fifty years that PCBs are a human systemic poison"), 28 ("At all material times, Westinghouse knew that the PCBs purchased from Monsanto would poison [the plaintiffs], but nonetheless continued to purchase from Monsanto the PCBs with which Westinghouse intentionally and knowingly caused the [plaintiffs] to be poisoned and injured"), 55 ("In 1938, doctors warned Monsanto and Westinghouse of the toxicity of PCBs"), 56 ("By 1938, Westinghouse had learned that 'contact of [PCBs] with the skin' would cause systemic effects, including 'injurious effects on the liver' "), 58 ("By 1947, Westinghouse knew that chronic poisoning may occur with repeated exposures to sufficient concentrations of PCBs and the exposures 'may produce internal bodily injury, which may be disabling or could be fatal.' Westinghouse also knew that PCBs are 'highly toxic if taken internally' "), 63 ("By 1959, Westinghouse knew that respirators should be used to protect workers when PCB vapors exceed the Maximum Allowable Concentrations").

Westinghouse was also a sophisticated user of Monsanto products. Monsanto produced Inerteen for Westinghouse according to Westinghouse specifications. Papageorge Aff. ¶ 8 & Ex. A. Westinghouse specified both the chemical and physical properties for the Inerteen it purchased from Monsanto. *See* Papageorge Aff. ¶ 8, Ex. A. Westinghouse developed Inerteen after seventeen years of its own research effort, as reported in a 1938 Westinghouse Transformer Engineering Data Letter.

> Research work to find a non-inflammable liquid which would satisfactorily take the place of transformer oil, dates back within the Westinghouse organization to 1921 . . . . During the past five years, Westinghouse Research Engineers have met with marked success, and the result is a liquid known as 'Inerteen.'

Kaminski Aff. Ex. 1; *see also* Papageorge Aff. ¶ 8 ("Westinghouse established product specifications for the PCB-containing dielectric fluids it purchased. Westinghouse gave its PCB fluids the trade name, 'Inerteen,' because of their chemically stable, or 'inert,' character."). Westinghouse had a medical department, as well as engineering and environmental departments, dedicated, at least in part, to exploring the effects of Inerteen and Monsanto oils. *See, e.g.,* Kaminski Aff.Exs. C (1947 letter from Westinghouse Headquarter's Medical Department), S (1972 letter from Westinghouse Capacitor Unit Engineering), U (1972 memorandum from Westinghouse Environmental Control Section), HH (1973 Westinghouse "Policy–Procedure" on Inerteen generated by Transformer Divisions, including Section on "Fluid Insulation"); Bistline Aff.Exs. A (1959 letter to Administrator of Westinghouse's Industrial Hygiene Division), B (1962 letter to Administrator of Westinghouse's Industrial Hygiene Division). In fact, as early as 1947, Westinghouse's medical department was aware of the dangers Inerteen posed to those handling it. Kaminski Aff.Ex. C (letter from Westinghouse Headquarter's medical department stating that "Inerteen is a fairly toxic material"); *see also* Bistline Aff. Ex. B. at p. 1 (identifying Ed Barnes, author of medical department letter, as Westinghouse employee extremely knowledgeable of effects of working with Monsanto products).

By 1959, it is clear that Monsanto relied on the fact that Westinghouse was a knowledgeable purchaser of its products. In a letter to Wilbur Spreicher, Westinghouse's Administrator of Industrial Hygiene, Monsanto warned of unknown, but serious, dangers associated with the Monsanto products. Monsanto advised that it was plain that "sufficient exposure, whether by inhalation of vapors or skin contact, can result in chloracne which I think we must assume could be an indication of more serious systemic injury if the exposure was allowed to continue." Bistline Aff.Ex. 1 at p. 1–2. Monsanto explicitly referred to Westinghouse's "some 20–25 years' experience with the products," and directed Spreicher to two other Westinghouse employees as "a source of information regarding experience with Inerteen PPO." *Id.* In fact, the Monsanto author states that he "would be interested in learning of their [the two Westinghouse experts'] practical experience with the[ ] products." *Id.* at 3.

Monsanto was also aware that Westinghouse was in a superior position to assess hazards and determine safeguards for Westinghouse employees. In a 1962 letter from Monsanto again directed to Spreicher, Monsanto states:

> From your familiarity with the Aroclors as a class of compounds, I know you appreciate that it is a mistake to attempt to describe safe handling practices in generalities....
>
> The experience of your company in handling the specific Aroclors that you use should dictate where and at what temperatures local exhaust ventilation should be provided. I can think of no better experts than you and Ed Barnes as to what control measures are necessary in your own plants.

Bistline Aff.Ex. B. at p. 1.

Monsanto did not control the use of its products at the Westinghouse sites. "Once Monsanto delivered Inerteen or Therminol to Westinghouse, Monsanto had no control over the handling or use of any Inerteen or Therminol, nor did Monsanto have any control over the safety and handling communications made to Westinghouse employees." Papageorge Aff. ¶ 12. Westinghouse made its own decisions about the handling and use of PCBs at its plants. *Id.;* Kaminski Aff.Exs. M (1970 Westinghouse Inerteen Control Sheets) P (1971 Westinghouse Inerteen Control Alert); R (1971 minutes from Westinghouse meeting discussing need to provide customers with information on PCB hazards and instructions for PCB disposal); U (1972 Westinghouse Letter discussing "attached proposed 'Policy for the Use and Handling of Inerteen' "); V (1972 Westinghouse "Bloomington Works" memorandum on use and handling of Inerteen); W (1972 Westinghouse "Bloomington Works" review of PCB controls); X (1972 Westinghouse "Bloomington Works" memorandum on disposal of Inerteen); Y (1976 Westinghouse memorandum listing documents available to employees regarding Inerteen use or disposal); HH (1973 Westinghouse "Policy for the Use and Handling of Inerteen"). Inerteen was delivered to Westinghouse in railroad cars, tank trucks and fifty-five gallon drums. Papageorge Aff. ¶ 9. Monsanto's Therminol was also delivered to Westinghouse for use in its Muncie plant in fifty-five gallon drums. Papageorge Aff. ¶ 11. There was no way for Monsanto to label directly the fluids it sold to Westinghouse. Papageorge Aff. at ¶¶ 10, 11.

Plaintiffs maintain that Westinghouse was not a knowledgeable and sophisticated purchaser of Monsanto products because it relied on Monsanto as the primary source of PCB–related information. Plaintiffs' Br. in Opp. to Defendant's Motion for Summary Judgment, at 6–7; *see also* Plaintiffs' Br. in Support of Motion for Partial Summary Judgment, at 6. Yet the documents they point to in support of this proposition simply do not demonstrate that Westinghouse relied upon Monsanto for information, and, in fact, they bolster Monsanto's position that it warned Westinghouse of dangers associated with its products.

For example, Plaintiffs point to a 1960 Monsanto report, found in Westinghouse files, entitled, "The Proper Handling of Aroclors and Their Mixtures in the Electrical Industry," as evidence of Westinghouse reliance upon Monsanto as the "primary source" of PCB information. *See* Plaintiffs' Br. In Opp. at 6–7 (referring to Kaminski Aff.Ex.

G). However, there is no evidence of the degree of reliance Westinghouse placed upon the report, if any. The report, in fact, warns of dangers associated with the use of Monsanto products:

> Aroclors, or askarels, accidentally spilled on the skin do not cause an acute toxicity hazard, nor will they cause serious irritation.... [Although p]rolonged skin contact should be avoided....
>
> Vapors from hot Aroclor, or askarel, have a degree of toxicity and should not be inhaled over a prolonged period of time. Experimental work on animals indicates that the maximum safe concentrations of vapors in work rooms is in the range of 0.5 to 1.0 mg. per cubic meter of air.

Kaminski Aff.Ex. G.

Plaintiffs submit what appear to be Monsanto guides, entitled "Here's How to Get More Performance and Save Money When Specifying Transformers," (Plaintiffs' Ex. 1 (undated)) and "Inspection and Maintenance Guide," (Plaintiffs' Ex. 5 (1963)) as evidence that Westinghouse relied on Monsanto as the "source for information pertaining to the guidelines for the handling and disposal of PCBs." Plaintiffs' Br. for Partial Summary Judgment, at 6. However, there is no evidence that Westinghouse received these Monsanto brochures, let alone relied upon them. Plaintiffs submit two additional exhibits—a Monsanto press release about its actions vis-a-vis the environmental problems caused by its products and an internal Monsanto memorandum—as additional evidence that Westinghouse "relied on Monsanto for toxicological information." Plaintiffs' Br. for Partial Summary Judgment, at 6. Again, neither of these exhibits demonstrates that Westinghouse relied on Monsanto for information on toxicity of Monsanto products.

Plaintiffs also point to cautionary labels provided by Monsanto to Westinghouse for the Inerteen and Therminol products. Pl. Br. in Opp. at 7. Once again, however, there is no evidence that Westinghouse relied on these labels as a meaningful source of information regarding the dangers associated with the use of Monsanto products. It strains credulity, given the degree of information independently produced by Westinghouse, to believe that Westinghouse primarily relied upon those warning labels. Nonetheless, the warning labels supplied by Monsanto to Westinghouse did warn of dangers associated with the products. The Inerteen labels stated:

---

**CAUTION!**
CONTAINS CHLORINATED HYDRO-CARBONS

---

Avoid prolonged breathing of vapors or mists.

Avoid contact with eyes or prolonged contact with skin.

If skin contact occurs, remove by washing with soap and water. Following eye contact flush with water.

If clothing becomes soaked with fluid, launder before wearing again.

Kaminski Ex. H (1969 Monsanto warning labels provided to Westinghouse).

Plaintiffs understandably cite a 1975 Monsanto letter directed to a Westinghouse staff supervisor in its Personnel Relations Department as evidence that Westinghouse was neither sophisticated nor knowledgeable about the use of Monsanto products. Plaintiffs' Opp.Ex. 9. The letter responds to questions posed by the Westinghouse personnel supervisor, including whether Inerteen can have permanent effects on the human body and whether it can cause sterilization in humans. *Id.* These questions could certainly indicate a lack of knowledge about the effects of Inerteen, at least by the personnel supervisor. However, they do not overcome the overwhelming evidence that Westinghouse had a host of other employees dedicated to answering precisely the questions raised in the personnel department supervisor's letter. We will not speculate as to why Westinghouse's personnel supervisor chose to seek answers about Inerteen from Monsanto, rather than from an "in-house" source, such as the Westinghouse Industrial Hygiene or Medical Departments. However, the fact that the Westinghouse personnel department may not have been knowledgeable about the toxic effects of Inerteen does not change the fact that other Westinghouse departments

were extremely knowledgeable and sophisticated about the dangers associated with the Monsanto products Westinghouse was purchasing.

In 1971, for instance, the Westinghouse Ocean Research Laboratory proposed "A Study of the Environmental Contamination Resulting from Polychlorobiphenyl Use by the Electrical Industry" to the United States Environmental Protection Agency. Kaminski Aff.Ex. L. In that proposal, Westinghouse stated that its:

> personnel are in a particularly advantageous position to gather information on PCB's [sic] not normally available to people outside the electrical industry. Available to W[estinghouse] are the vast resources of the Westinghouse Electric Corporation *which includes many experts on the industrial use of PCB's* [sic]. Westinghouse's long-standing relationship with Monsanto Chemical Co. (sole U.S. supplier of PCB) will facilitate gathering production and distribution information for the proposed program.

Kaminski Aff.Ex. L at 3 (emphasis added). Minutes from a 1971 Westinghouse meeting regarding the status of PCBs also reveal that Westinghouse was extremely knowledgeable and sophisticated about the dangers associated with these products, (Kaminski Aff. Ex. R), noting that although "the biological activity of pcbs was at best poorly defined," higher chlorinated biphenyls "appear to concentrate . . . in the liver of fish, birds, and some animals"; the "toxicity of pcbs in any absolute terms cannot be expressed, but . . . lower chlorinated biphenyls (3 or less) appear to be more toxic than the higher chlorinated biphenyls"; and "[w]ith respect to birds . . . the reproductive cycle is adversely affected by the presence of pcbs." Kaminski Aff.Ex. R at 1–2. The memorandum mentions the "only documented case of ingestion in humans is one that occurred in Japan":

> There is much controversy as to whether the conditions brought on in the Japanese exposure were due to the pcbs or to an impurity called chlorinated dibenzo furans. Monsanto claims that pcbs manufactured by European chemical companies contain about 15 to 10 ppm of the chlorinated

dibenzo furans. . . . *Monsanto claims that the product made in this Country [sic] is essentially free from this impurity. However, we have no analytical data either from Monsanto or our own which confirm or deny the existence of this impurity in the product we use. Mandelcorn and Gainer were of the opinion that it would be a relatively straightforward analytical procedure to determine if material which we use contains this chemical.*

Kaminski Aff.Ex. R at 2. Again, clearly, Westinghouse was quite knowledgeable of dangers associated with PCBs, and it was clearly sophisticated: it had its own staff capable of analyzing chemical properties of the materials it was purchasing from Monsanto and it plainly understood the need to pursue those analyses.

In 1972, Westinghouse submitted its first draft of the "Capacitator Plant Housekeeping and Employee Safety" portion of a report, ultimately issued in 1974, by the American National Standards Institute on "Guidelines for Handling and Disposal of Capacitor–and Transformer–Grade Askarels Containing Polychlorinated Biphenyls." *See* Kaminski Aff. Ex. S; Plaintiffs' Ex. 3. Westinghouse's draft confirms that it was exceedingly knowledgeable and sophisticated regarding the use of PCB fluids. *See* Kaminski Aff.Ex. S. In fact, a Westinghouse report on the status of polychlorinated biphenyls, also published in 1972, lists no fewer than forty-one Westinghouse personnel "concerned with polychlorinated biphenyls (PCB)." Kaminski Aff.Ex. T. These reports predate the 1975 letter from Westinghouse's personnel department to Monsanto and reinforce that Westinghouse was plainly knowledgeable and sophisticated regarding dangers associated with PCBs.

In short, Westinghouse was both extremely knowledgeable of and sophisticated about the dangers associated with Inerteen and the Monsanto products. *Cf. Shanks,* 416 N.E.2d at 837–38; *Burton,* 529 F.2d at 111–12; *York,* 586 N.E.2d at 871–72. It was impossible for Monsanto to anticipate and to access all of the Westinghouse employees who would come into contact with its products, primarily because it had no final control over

where and how Westinghouse was using its products. *Cf. Hoffman,* 448 N.E.2d at 286; *Shanks,* 416 N.E.2d at 837–38; *Burton,* 529 F.2d at 111; *York,* 586 N.E.2d at 869. Coupled with the fact that Monsanto oils could not be directly labeled, (*cf. York,* 586 N.E.2d at 869), it is plain that Westinghouse was a sophisticated and knowledgeable bulk purchaser of Monsanto products.

■ Plaintiffs maintain that, even if Westinghouse was a sophisticated and knowledgeable purchaser of Monsanto oils, Monsanto's warnings were nonetheless "grossly inadequate" Plaintiffs' Opp.Br. at 10. They maintain that Monsanto's warnings to Westinghouse were "warnings with a wink"—that is to say, Monsanto's so-called warnings did not come close to seriously alerting Westinghouse of the dangers associated with its products.

■ Before we turn to the question of whether Monsanto's warnings to Westinghouse were adequate under the circumstances, two points are worth noting. First, "[i]n Indiana, the issue of the adequacy of warnings in a strict liability case is governed by the same concepts as in negligence." *Jarrell,* 528 N.E.2d at 1166. Second, adequacy of warnings is a classic question of fact reserved to the trier of fact, and therefore, usually regarded as an inappropriate issue for resolution on summary judgment. *Jarrell,* 528 N.E.2d at 1162; *Sills v. Massey–Ferguson, Inc.,* 296 F.Supp. 776, 778–79 (N.D.Ind.1969). Nevertheless, Indiana courts as well as courts applying Indiana law have resolved the issue of adequacy of warnings on motions for summary judgment, when it is possible to determine as a matter of law that the warnings to third parties were adequate under the circumstances. *See, e.g., York,* 586 N.E.2d at 871 & 872 (resolving adequacy of warnings issue on summary judgment in favor of manufacturer where it was "apparent that [there was] no information [the manufacturer] could have added to increase [the purchaser's] knowledge of the characteristics of argon gas" where it was "clear that [the purchaser] had a great deal of knowledge concerning the effect of argon gas in a confined space."); *see also Burton,* 529 F.2d at 111–12 (affirming summary judgment where manufacturer had no duty to make known to purchaser-company properties of product of which they were already aware).

As discussed *supra,* Monsanto did issue Westinghouse warnings and safe handling instructions regarding Monsanto products and PCBs. As early as 1959, for example, Monsanto specifically warned Westinghouse that "repeated skin contact with any of the Aroclors ... could lead to chloracne ... which ... could be an indication of more serious systemic injury if the exposure was allowed to continue." Bistline Aff.Ex. A at 1–2; *see also* Bistline Aff.Ex. B (1962 Monsanto letter advising Westinghouse on ventilation requirements for different Aroclor fluids); Bistline Aff.Ex. C (1969 Monsanto letter to Westinghouse discussing chlorinated biphenyls in certain Therminol fluids and enclosing a report on "toxicity of Aroclor 1242 and 1254."); Bistline Aff.Ex. D (1971 Monsanto letter informing Westinghouse that eight pounds of reports and publications on PCBs, including animal toxicity studies, were being shipped to Westinghouse); Papageorge Aff.Ex. B (Inerteen warning labels); Papageorge Aff. at 9 & Ex. C (1971 Monsanto "Material Safety Data Sheet" provided to Westinghouse describing "effects of overexposure" as "[s]kin irritation in the form of chloracne, systematic intoxication leads to nausea, vomiting, loss of weight, edema and abdominal pain."); Papageorge Aff.Ex. D (Therminol warning labels); Kaminski Aff.Ex. E (1956 Monsanto letter to Westinghouse enclosing Aroclor toxicity reports, recommending "repeated and prolonged skin contact with any of the Aroclors be avoided," and stating that, "[a]s with many chlorinated hydrocarbons, exposure to sufficient quantities over a long enough period of time could conceivably result in chloracne ... [H]owever, the aroclors are not the potent chloracnegens, such as chlorinated naphthalenes. To our knowledge, there have never been any cases of chloracne in the electrical industry's use of these products."); Kaminski Aff.Ex. G (discussed *supra*) (1960 Monsanto guide on "Proper Handling of Aroclors and their Mixtures in the Electrical

Industry"); Kaminski Aff.Ex. H (Inerteen warning labels).

Plaintiffs' contention that Monsanto's warnings to Westinghouse were "warnings with a wink" is based on the fact that Monsanto issued statements over a thirty-to-forty year period representing that no worker exposed to askerals was seriously injured. Plaintiffs maintain that Monsanto made this representation even though it never reviewed the medical files of workers exposed to askerals. This statement, thus, was a bald lie, they say, designed to mislead Westinghouse and facilitate the continued sales of Monsanto products. Having been advised that no Monsanto worker was ever injured as a result of askeral exposure, Westinghouse would necessarily discount any other so-called warning issued by Monsanto, according to Plaintiffs' argument. Plaintiffs' Br. In Support of Motion for Partial Summary Judgment, at 10.

However, there simply is no evidence that Monsanto misrepresented the medical impact of askerals on its workers. Plaintiffs cite three pieces of evidence to support their position that Monsanto's statement was a "blatant falsehood." *See* Plaintiffs' Br. In Support of Motion for Partial Summary Judgment, at 9. The first is a 1970 telecommunication from Monsanto to a Monsanturop, Brussels representative:

> RE YOUR WIRE ... CONCERNING FREQUENCY OF MEDICAL CHECKS WE GIVE *NO OTHER MEDICAL TEST* TO PCB OPERATORS *APART FROM THOSE WE GIVE OUR USUAL EMPLOYEES.* WE KNOW ENGLAND DOES NOT GIVE ROUTINE EXAMINATIONS AND WE SEE NO REASON TO START IT FOR PCB WORKERS.

(Plaintiffs' In Support of Motion for Partial Summary Judgment, Ex. 7 (emphasis added)). The second is a 1971 Monsanto memorandum stating:

> I understand ... that we do not have a 'medical program' concerning PCB's [sic] or DDT at this time.

(Plaintiffs' In Support of Motion for Partial Summary Judgment, Ex. 6). And, the third is a deposition statement by a Monsanto manager:

> Q: Why is it that about 1970 you had field trips that you have a person in charge of PCB's [sic]?
>
> A: The issue at that period of time, the seventies, was environmental, not employee safety. The subject of employee safety was really a review; nothing new was being added.

(Plaintiffs' In Support of Motion for Partial Summary Judgment, Ex. 8 (Papageorge Dep. at 57)).

None of these documents comes close to substantiating Plaintiffs' claim that Monsanto misrepresented its workers' experiences with its PCB products, and none of them, even when considered together, comes close to undermining the actual warnings Monsanto gave Westinghouse about the possible effects of prolonged skin exposure and inhalation of askerals. Although Monsanto appears not to have singled out PCB workers for special medical examinations, Monsanto obviously administered routine medical examinations to its employees, the results of which did not alert them to serious injuries associated with exposure to askerals. Plaintiffs' Motion for Partial Summary Judgment, Ex. 7. Significantly, the only document Plaintiffs can point to which expressly states that "medical records" demonstrated anything about the medical hazards resulting from worker exposure to PCBs was not even a Monsanto publication. *See* Plaintiffs' In Support of Motion for Partial Summary Judgment, Ex. 3 (American National Standard Guidelines). And, while it may be true that a Monsanto employee chaired the American National Standard's Committee responsible for writing the Guidelines, as discussed *supra*, Westinghouse was also a member of that Committee and even participated in drafting sections of those Guidelines. Kaminski Aff.Exs. O, S. It simply is not reasonable to conclude that a statement contained in a jointly written Guideline on PCBs would effectively undermine Monsanto's repeated warnings to Westinghouse regarding the dangers associated with askeral fluids.

Plaintiffs insist that Monsanto's unconditional statement concerning the lack of ill effects is betrayed by Monsanto's knowledge

of the fact that Aroclor fluids were toxic and that improper handling or inhalation had caused workers' health problems. However, Monsanto rightly rejoins that implicit in its statements regarding the lack of serious effects on workers was the requirement that the products be used in accordance with Monsanto guidelines. Aroclor fluids were known toxics, and Monsanto repeatedly warned Westinghouse of possible effects of, and even incidents of, misusage of askarel fluids. *See* discussion, *supra.*

Plaintiffs reference to the fact that scientific literature was full of "red flags" that mandated the medical surveillance of PCB workers for adverse toxicological effects (Plaintiffs' Br. in Support of Motion for Partial Summary Judgment, at 11) falls short of establishing that Monsanto breached its duty by failing to provide adequate warnings to Westinghouse of the dangers associated with PCBs. The first such article cited by Plaintiffs, a 1936 report entitled "An Acneform Dermatergosis," does discuss a case study of chloracne resulting from exposure to chlorinated di-phenyl, but this study, focused on the complaints of an African–American man, concluded that the man "seemed in good general health ... [and a] general physical examination revealed nothing of importance." Plaintiffs Motion for Partial Summary Judgment, Ex. 9. Although this conclusion was likely reached, in part, due to racism (*e.g.,* the man's "complaint of lassitude was not borne out by anything more than the usual temperament of the Negro toward work"), thus, undermining its findings, the report can hardly be considered a red flag, even if there were evidence that Monsanto was aware of the report, and there is not.

A second report to Monsanto, this one dated in 1938, also dealing with the effects of exposure, ingestion and inhalation of chlorinated diphenyls, discussed possible health risks, including chloracne and liver damage, but concluded:

> From these experiments we are forced to conclude that concentrations of chlorinated diphenyl in workrooms should not be allowed to rise above 0.5 mg. Per cubic meter of air. This concentration is readily obtained by careful hooding. *It is our opinion safe for workmen who would not be exposed with the absolute steadiness characteristic of our experiments on rats and such a concentration limit would probable do away with the troublesome skin lesions which have been the particular cause for worry in regard to these compounds in the past.*

Plaintiffs' Motion for Partial Summary Judgment, Ex. 10 (emphasis added). Thus, the Drinker report concluded that some, limited exposure to Monsanto products would not be harmful to workers.

Defendant argues that an excerpt of a 1947 article, also cited by Plaintiff, is not admissible evidence, as it appears to be retyped and not the original, but this technicality is of no consequence. Even if considered, the report merely stresses the toxicity of Aroclors and the need for proper warnings and "recommendations for correct handling." Plaintiffs' Motion for Partial Summary Judgment, Ex. 11. Finally, Plaintiffs cite the already-discussed 1955 Monsanto letter stating that "Aroclors are toxic, but the actual limit has not been precisely defined." Plaintiffs' Motion for Partial Summary Judgment, Ex. 12. However, that Monsanto knew that Aroclors could be toxic at certain exposure rates is not disputed. Manufacturers may produce toxic materials; that they do is not evidence of wrongdoing. Thus, again, this evidence was not a "red flag" ignored by Monsanto. As previously discussed, Monsanto repeatedly advised Westinghouse about proper handling of its Aroclor products, and, in fact, Westinghouse generated its own handling instructions for the Inerteen and the Monsanto products it sold in its electrical transformers. *See* Kaminski Aff.Exs. Z (1952 Westinghouse "Instruction Book" on Inerteen); AA (1962 Westinghouse "Instructions for Inerteen"); BB (1968 Westinghouse "Instructions for Inerteen"); CC (1967 Westinghouse instructions for Inerteen use in Distribution Apparatus); DD (1974 Westinghouse instructions for Inerteen use in Distribution Apparatus); EE (1975) (same); FF (1961) (same); GG (1965 Westinghouse instructions on "Inerteen Insulated Capacitors" for Lighting Division); II (1953 Westinghouse "Safe Practice Data Sheet" regarding Chlorinated diphenyls

and chlorinated naphthalene); JJ (1962 Westinghouse "Safe Practice Data Sheet" on Inerteen); KK (1970) (same); LL (1971) (same); MM (1972) (same); NN (1970 Westinghouse "Safe Practice Data Sheet" on "Maximum Acceptable Concentrations (MAC) for Toxic Materials").

■ Plaintiffs maintain that, as early as 1956, Monsanto knew not only that Aroclors were toxic, but also that the dangers associated with their use were extreme and that any degree of exposure could have tragic health consequences. In support of this position, Plaintiffs submit the Affidavit of Dr. Ian Webber, a chemist, who, interpreting three documents, speculates as to what Monsanto should have been aware of in 1956 regarding the presence of furans and dioxins in its PCB fluids. Webber's affidavit loses persuasive force when it fails to qualify him as an expert qualified to testify on the similarities of trichlorophenol and polychlorinated biphenyls as he purports to do or on the appropriateness of manufacturer warnings. *Cf. Jarrell,* 528 N.E.2d at 1164 (expert on "human factors engineering" filed an affidavit discussing appropriateness of warnings on bags of sulphur). In its motion to strike, Monsanto makes clear that the Webber affidavit merely identifies Webber as a chemist, with no explanation of his education, training, background or expertise in the field of chemistry. Webber attests that since 1976 he "developed industry knowledge of polychlorinated bipenyls (PCBs), polychlorinated dibenzofurans (furans) and polychlorinated dibenzo-p-dioxins (dioxins)." Plaintiffs' Motion for Partial Summary Judgment, Ex. 14 (hereinafter "Webber Aff."). He states that he has "worked on problems presented by the retrofill of PCB transformers, the toxins produced by fires involving PCBs, the problems of PCB remedial cleanup of buildings and sites, and the liability associated with the ownership of . PCB contaminated equipment." Webber Aff. ¶ 1. Defendant asserts that this background does not establish an adequate foundation for Webber's opinions, and that he is not properly qualified as an expert. Plaintiffs have not responded to these criticisms. In advancing this argument, Defendant is correct. *See, e.g., Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993) (requiring expert witness testimony to be reliable and to assist trier of fact); *Tyus v. Urban Search Management,* 102 F.3d 256, 263 (7th Cir. 1997) (requiring expert's testimony to "adhere[ ] to the same standards of intellectual rigor that are demanded in [his] professional work") (quoting *Braun v. Lorillard Inc.,* 84 F.3d 230, 234 (7th Cir.1996)); *United States v. Hall,* 93 F.3d 1337, 1343 (7th Cir.1996) (expert witness' testimony must draw upon witness' special expertise); *Ansick v. Hillenbrand Indus. Inc.,* 933 F.Supp. 773, 780 (S.D.Ind.1996) (excluding witness' "expert" testimony where, although she had trained horses for many years and was generally an expert in the field of horses, she did not purport to be familiar with the specific temperament of blind horses). Accordingly, Defendant's motion to strike the Webber affidavit is **GRANTED.**

The documents attached to and incorporated in the Webber affidavit, which Plaintiffs' attorney, attesting through his own personal knowledge, represents to have been authenticated in a videotaped deposition by a now-deceased Monsanto employee, do not corroborate Plaintiffs' claim that Monsanto was aware that PCBs were a prohibitively toxic product. The documents, one of which is undated, do not discuss Monsanto's PCB products; rather, they discuss an industrial accident with trichlorphenol, produced from tetrachlorbenzene, that resulted in 50–60 cases of serious chloracne, as well as fatigue, vertigo, loss of libido and painful joints. Plaintiffs' Motion for Partial Summary Judgment, Ex. 14. Another document, which appears to be a 1965, internal Monsanto memorandum, states that dioxins, "[v]ery conceivably" could be a "potent carcinogen." Nonetheless, Plaintiffs have failed to demonstrate that Monsanto was aware that dioxins were in the askeral products being sold to Westinghouse for use in either the Bloomington or Muncie plants.

In summary, Plaintiffs have failed to adduce evidence raising a genuine issue of material fact concerning whether Westinghouse was a knowledgeable, sophisticated bulk purchaser of Monsanto oils and whether Monsanto's warnings to Westinghouse were ade-

quate under the circumstances. Monsanto supplied countless warnings to Westinghouse regarding dangers associated with its products. Westinghouse was a self-described expert in the use of the Monsanto products and in the hazards of PCBs in particular. Westinghouse was in control of Monsanto products in the Westinghouse plants, and it was in control of the ways in which its employees would handle and be exposed to those products. Given Westinghouse's level of expertise on the chemical properties and hazards of the aroclor fluids it purchased from Monsanto, it was reasonable for Monsanto to rely upon Westinghouse to warn its employees of the dangers associated with those products. Therefore, Plaintiffs' motion for partial summary judgment on their claims of tortious failure to warn is **DENIED,** and Defendant's motion for summary judgment on the tortious failure to warn claims under theories both of negligence and strict liability is **GRANTED.**

## C. *RICHARD SLUDER'S BATTERY CLAIM* [2]

Monsanto also moves for summary judgment on Plaintiff Sluder's battery claim. It asserts that the claim of battery requires a " 'harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent. . . .' " *Fields v. Cummins Employees Fed'l Credit Union,* 540 N.E.2d 631, 640 (Ind.App.1989) (quoting W. Keeton, Prosser & Keeton on the Law of Tort § 9 (5th ed. 1984)). By Monsanto's representations, all it did was sell products to Westinghouse, undertaking no intentional act with respect to exposing Plaintiff to PCBs, stressing that it had no control over the use or handling of those products in the Bloomington plant where Sluder worked.

Plaintiff Sluder maintains that because William B. Papageorge, a Monsanto employee whose job included focussing on environmental-PCB issues for Monsanto as well as serving as the Chair of the American Nation-

al Standards Institute Committee on PCBs, inspected the Bloomington plant and saw workers being hazardously exposed to PCBs, yet did nothing to stop that exposure, he committed battery upon Sluder. Plaintiff's evidence simply does not support his contention, as we now explain.

■ First, Sluder erroneously states that Papageorge testified in his deposition that, if he believed PCB exposure was excessive at the Bloomington Plant, he would have had a duty to stop sales. *See* Plaintiff's Br. In Opposition to Defendant's Motion for Summary Judgment, at 13 (citing Ex. 19 (Papageorge deposition)). Even if Papageorge had actually testified to that effect, a duty would not be thus created.

In his affidavit, Papageorge does state:

In 1970, I visited Westinghouse's Bloomington plant and met with plant personnel. I observed the plant as being very clean and well maintained. My observations of the Bloomington plant and discussions with its personnel demonstrated to me that the plant was aware of the environmental and worker handling concerns relating to PCB, dielectric fluids and was implementing use and handling procedures to address those concerns.

Papageorge Aff. at ¶ 13. Sluder points out that, notwithstanding that statement, Papageorge testified in a deposition that he saw PCBs on the floor of the Bloomington plant, "entrapped in the sawdust that was deliberately placed there to do just that." Plaintiffs' Ex. 7 (Papageorge Dep. at 37). Sluder maintains that when this occurred, Papageorge knew there should be no PCBs on the floor, as evidenced in a letter he wrote to Westinghouse's personnel supervisor. Plaintiffs' Br. In Opposition to Monsanto's Motion for Summary Judgment, at 13. However, Plaintiff supplies no evidence that Papageorge was aware at the time he inspected the Bloomington plant that PCBs should not be on the floor or in sawdust placed on the floor to absorb PCB fluid. The letter Sluder cites as evidence that Papageorge knew at

---

**2.** As mentioned above, Plaintiff Taylor withdrew his battery claim in response to Monsanto's motion for summary judgment. Both Plaintiffs withdrew their conspiracy claims. Accordingly, these claims are dismissed with prejudice.

the time he inspected the Bloomington plant that the workers there were being exposed to PCBs was written five years after his reported visit to inspect Westinghouse's Bloomington plant. Plaintiffs' Opp.Ex. 9. In other words, there is no evidence to establish that at the time Papageorge inspected the Bloomington site, he knew that the floors should be free from PCBs.

Sluder states that the law is "dramatic and clear" in its favor on this issue. However, the only case cited by Sluder to support his position that this sort of battery claim is actionable against a manufacturer involved a claim against a plaintiff's employer. *See Gulden v. Crown Zellerbach Corp.*, 890 F.2d 195, 196 (9th Cir.1989) (denying motion for summary judgment on battery claim where plaintiffs' employer ordered them to clean PCB spill "on their hands and knees without protective clothing."). Although it is conceivable that a manufacturer could withhold information to such an extent that the withholding and deceit reach the level of an affirmative act such as battery entails, *see, e.g., Mink v. University of Chicago*, 460 F.Supp. 713, 721 (N.D.Ill.1978) (finding battery claim against manufacturer actionable where allegation demonstrates intentional concealment of known facts it "exceeds mere silence and approaches affirmative action."), Sluder has failed to come forth with any evidence demonstrating the requisite intent. Sluder's factual contentions do not support his theory of battery. Accordingly, Defendant's motion for summary judgment on Plaintiff Sluder's claim of battery is **GRANTED**.

### D. *PLAINTIFFS' FRAUD CLAIMS*

■ Plaintiffs both maintain that Monsanto "falsely, fraudulently and consistently represented that medical records proved that no worker had ever been injured by PCBs." Plaintiffs' Br. In Opposition to Defendant's Motion for Summary Judgment, at 14. Accordingly, Monsanto's "fraud [was] on those in a position to help and protect the plaintiffs" and upon the Plaintiffs themselves. *Id.*

As discussed *supra*, the evidence fails to support this contention. There is no proof that Monsanto stated that it reviewed medical records or that Monsanto's statement about the use of PCBs on its workers was untrue at the time it was made. This failure to demonstrate that Monsanto made a false statement, let alone that it did so with knowledge of or in reckless ignorance of its falsity, *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind.1992), requires that Monsanto's motion for summary judgment on Plaintiffs' fraud claims be and the same hereby is **GRANTED**.

### E. *LOSS OF CONSORTIUM CLAIM*

■ Plaintiff Sluder's wife, Deittra Dian Sluder, alleges a loss of consortium claim against Monsanto based on her husband's injuries. However, her loss of consortium claim is derivative and dependent upon the viability of her husband's claims. *Watters v. Dinn*, 666 N.E.2d 433, 438 (Ind.App.1996); *Nelson v. Denkins*, 598 N.E.2d 558, 563 (Ind. App.1992). As discussed, Sluder's claims against Monsanto are not viable; accordingly, neither is his wife's. Defendant's motion for summary judgment on Ms. Sluder's loss of consortium claim is **GRANTED**.

### III. *CONCLUSION*

For the reasons discussed above, Defendant's motion for summary judgment on Plaintiffs' claims of tortious failure to warn and fraud is **GRANTED**. Defendant's motion for summary judgment is also **GRANTED** on Plaintiff Sluder's claim of battery and on his wife's claim of loss of consortium. Plaintiff Taylor's claim of battery and Plaintiffs' claims of conspiracy were withdrawn in response to Defendant's motion for summary judgment and, thus, are also dismissed with prejudice. For the reasons discussed, Defendant's motion to strike the Webber affidavit is **GRANTED**; to the extent not discussed, Defendant's motion to strike Plaintiffs' exhibits is **DENIED** as moot. Plaintiffs' motion for partial summary judgment is **DENIED**.

It is so ORDERED.